(C. D. 579)

CARGILL GRAIN CO., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 7, 1942)

*Siegel & Mandell* (*Sidney Mandell* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard F. Welsh* and *Joseph F. Donohue,* special attorneys), for the defendant.

Before CLINE and KEEFE, Judges

KEEFE, Judge: This action involves several shipments of rye from Poland. The plaintiff claims that insufficient allowance was made by the collector for impurities, etc., and duty was therefore assessed upon more merchandise than entered the commerce of the country.

At the trial counsel for the parties hereto entered into the following agreement as to the facts in the case.

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, by their respective attorneys:

1. On November 21, 1934 the plaintiff herein made one importation (Entry #A–70069), hereinafter called the 1934 importation when referred to separately, and from time to time during the year 1935 made a total of nine importations, hereinafter called the 1935 importation when referred to separately, of Polish rye, a grain, at Albany, N. Y.

2. With respect to each importation, the importer made and completed an entry for consumption and deposited the estimated duties thereon, at which time the collector forthwith issued to the importer an official permit (Form 7501–A) for the delivery of the rye to the importer, a copy of a typical one of which is annexed hereto, and made a part hereof, marked "A". No entry for warehouse was made with respect to any of said importations.

3. With respect to each of the 1935 importations, the Collector upon request of the importer and after the expiration of one day after the entry of the vessel, ordered that the rye be sent to the grain elevator owned and operated by the importer and located on Van Rensselaer Island in Albany, N. Y. With respect to five of the 1935 importations, such order was issued prior to the making of entry for consumption and deposit of estimated duties as set forth in paragraph 2 hereof. With respect to the remaining four of the 1935 importations, such order was issued subsequent to such entry for consumption and deposit of estimated

duties.   A copy of a typical one of such orders, executed on Form 3193, entitled
" 'General Order' to Send Unpermitted Packages from Wharf to Public Store," is
attached hereto, made a part hereof and marked "B".   With respect to the 1934
importations, no such order was issued.

4.  With respect to the said grain elevator, the importer, prior to the time of the
importations involved herein, pursuant to the provisions of Section 555 (a),
Tariff Act of 1930, filed with the Collector its bond to constitute said grain ele-
vator a bonded warehouse for the purposes set forth in said bond.   This bond was
in full force and effect at the time of each importation involved herein, and the
said grain elevator was a bonded warehouse as authorized by said section 555 (a)
to the extent and for the purposes set forth in the bond.   A copy of said bond,
together with a copy of a letter from the importer to the Collector, dated July 2,
1932, and a copy of a letter from the Deputy Collector in Charge to the Collector,
dated July 12, 1932, relating to said bond, are annexed hereto, made a part
hereof, and marked "C".

5.  With respect to each importation, the rye was inspected by the Department
of Agriculture, and after the rye was placed in the said grain elevator, and after
the making of entry for consumption, deposit of estimated duties, and issuance
of the delivery permit, the Department of Agriculture made a finding that the
rye was adulterated, consisting in whole or in part of filthy, decomposed or putrid
vegetable substances, and contained animal excreta, and that it did not comply
with the Food and Drugs Act of June 30, 1906.   However, the Department of
Agriculture granted permission to the importer to recondition the rye by remov-
ing the objectionable matter for destruction under Customs supervision.   Upon
such finding the Collector, pursuant to Article 541 (e) of the Customs Regulations
of 1931, issued to the importer a statement of the violation, setting forth said
condition that the rye might be thus reconditioned and the objectionable matter
so destroyed.   A copy of a typical one of such statements of violations and con-
ditions (Form "F. D. 776a") is annexed hereto, and made a part hereof, marked
"D".

6.  After the issuance of each such statement of violation and condition, and
after the making of entry for consumption, deposit of estimated duties, and is-
suance of the delivery permit, the importer with respect to each importation
filed an application, using Customs Form 3499, to recondition the rye by drying
and/or cleaning in the said grain elevator in order to comply with the said con-
dition fixed by the Department of Agriculture.   The Deputy Collector in charge
at Albany issued a permit, with respect to each importation, for the operation
requested.   A copy of a typical one of such applications and permits is annexed
hereto, made a part hereof, and marked "E".

7.  After the issuance of each such permit to recondition, the importer, while
the rye was in said grain elevator, subjected it to various reconditioning proc-
esses, to wit, drying and/or cleaning, which was apparently done under Customs
supervision.

8.  As a result of such reconditioning processes, there were certain losses from
the quantities originally placed in the said grain elevator after the unlading of
the vessels.   These losses were of three kinds:

    (1)  Losses amounting to 51050 bushels and 10 lbs. of visible
        impurities;

    (2)  Losses amounting to 164074 bushels, and 40 lbs. due to loss of
        moisture incurred in the drying process, and

    (3)  Invisible losses amounting to 98027 bushels and 50 lbs. incurred
        in the cleaning process.

9.  With respect to each of the 1935 importations, after such reconditioning had
been effected, the importer lodged with the Collector the delivery permit which

had been issued to the importer at the time entry for consumption was made, as set forth in paragraph 2 hereof, and removed the reconditioned rye from the said grain elevator. With respect to the 1934 importation, the importer lodged such delivery permit with the Collector forthwith upon receiving it at the time said consumption entry was made. No warehouse withdrawal, as provided in Sections 556 and 557, Tariff Act of 1930, and article 324 of the Customs Regulations of 1931, was filed with respect to any of the importations.

10. The general procedure followed with respect to these importations, whereby no entries for warehouse were made, and the grain placed in the elevator under an order entitled " 'General Order' to Send Unpermitted Packages from Wharf to Public Store," was carried out in an effort to provide the importer with the privilege of storing the rye in a bonded elevator for a period of one full year under the provisions of Sections 490 and 491 of the Tariff Act of 1930 instead of for a period of ten months as then provided for storage of grain entered for warehouse, by Section 557 of said Tariff Act.

11. The entries were liquidated at 15 cents per bushel of 56 pounds under the provisions of paragraph 728, Tariff Act of 1930. There is no controversy herein relative to this classification. However, in liquidating and assessing duties, the Collector made allowance for the poundage of the refuse obtained from the cleaning process which was destroyed under Customs supervision, but refused to make allowance for the loss in weight in excess of that actually destroyed under Customs supervision.

12. A detailed recapitulation of the facts with respect to each entry involved is as follows:

| Vessel | Tercero | Snestad | Eir | August | Taiwan |
|---|---|---|---|---|---|
| Arrived | 11/21/34 | 1/12/35 | 3/20/35 | 3/22/35 | 4/-35 |
| Cons. Entry # | A70069 | A70093 | A70127 | A70130 | A70140 |
| Date, entry, payment, est. duties, issuance, delivery permit. | 11/21/34 | 1/12/35 | 3/20/35 | 3/23/35 | 4/2/35 |
| Date sent to elevator under G. O | | 1/15/35 | 3/22/35 | 3/25/35 | 4/2/35 |
| General order No | none issued. | G153 | G156 | G157 | G158 |
| Date of detention, Notice, Dept. of Agric | Unknown | 1/29/35 | Unknown | 3/28/35 | 4/16/35 |
| Date of statement of condition, Dept. of Agriculture. | 12/11/35 | 2/15/35 | 3/30/35 | 4/3/35 | 4/25/35 |
| Date of permit to recondition | 12/14/34 | 1/29/35 | 4/1/35 | 4/5/35 | 4/25/35 |
| Date of completion of reconditioning | 3/6/35 | 3/6/35 | 4/28/35 | 5/25/35 | 6/11/35 |
| Date of completion of destruction, visible impurities. | 5/16/35 | 5/9 to 5/16/35. | 5/16/35 | 5/22/35 | 8/7/35 |
| Date of 1st delivery | 11/1/34 | 4/2/35 | 10/14/35 | 9/3/35 | 10/14/35 |
| Date of completion of delivery & lodging of permit. | 11/21/34 | 5/23/35 | 10/14/35 | 9/3/35 | 10/14/35 |
| | Bu. Lb. | Bu. Lb. | Bu. Lb. | Bu. Lb. | Bu. Lb. |
| Quantity, visible impurities destroyed | 6009 36 | 4830 | 4458 32 | 5245 20 | 5810 20 |
| Loss of moisture by drying | 11700 26 | no drying | 14927 08 | 17488 22 | 13630 34 |
| Invisible loss, cleaning | 7499 16 | 6148 28 | 8988 32 | 8856 24 | 9431 40 |

| Vessel | Vinland | Hope-crest | Dulwich | Theodore Roosevelt | Tercero |
|---|---|---|---|---|---|
| Arrived | 5/19/35 | 5/30/35 | 6/7/35 | 6/25/35 | 6/24/35 |
| Cons. Entry | A70186 | A70197 | A70038 | A80037 | A70039 |
| Date, entry, payment, est. duties, issuance, delivery permit. | 5/29/35 | 6/5/35 | 8/8/35 | 8/8/35 | 8/8/35 |
| Date sent to elevator under G. O | 5/23/35 | 6/1/35 | 6/12/35 | 6/27/35 | 7/25/35 |
| General order No | G174 | G179 | G182 | G186 | G185 |
| Date of detention, notice, Dept. of Agric | 6/5/35 | 6/7/35 | 8/21/35 | 8/21/35 | 8/21/35 |
| Date of statement of condition, Dept. of Agriculture. | 6/21/35 | 6/21/35 | 8/28/35 | 8/28/35 | 8/28/35 |
| Date of permit to recondition | 6/6/35 | 6/23/35 | 8/29/35 | 8/29/35 | 9/2/35 |
| Date of completion of reconditioning | 7/5/35 | 7/23/35 | 9/14/35 | 10/14/35 | 10/1/35 |
| Date of completion of destruction, visible impurities. | 8/7/35 | 8/7/35 | 10/2/35 | 10/18/35 | 10/2/35 |
| Date of 1st delivery | 10/14/35 | 10/14/35 | 10/14/35 | 9/24/35 | 10/14/35 |
| Date of completion of delivery and lodging of permit. | 10/14/35 | 10/14/35 | 10/11/35 | 10/22/35 | 10/14/35 |
| | Bu. Lb. | Bu. Lb. | Bu. Lb. | Bu. Lb. | Bu. Lb. |
| Quantity, visible impurities destroyed | 4782 18 | 5173 12 | 4376 54 | 4955 40 | 5407 48 |
| Loss of moisture by drying | 16572 8 | 21847 8 | 18882 18 | 24533 52 | 24542 28 |
| Invisible loss, cleaning | 9564 36 | 8048 2 | 9092 28 | 16582 16 | 13815 52 |

The plaintiff contends that duties should have been levied only upon the amounts of rye actually withdrawn from the bonded warehouse by the importer subsequent to the reconditioning; that the importer is entitled to the benefit of the provisions of section 562 and to an allowance, not only for the merchandise actually destroyed in bonded warehouse, but for that lost through reconditioning; or, alternatively that the cleaning loss is a nonimportation and even if an allowance should not be made for loss of moisture obtained through the drying process, due allowance should be made for the last item set forth in the recapitulation embraced in the stipulation herein, which sets forth in connection with each of the entries, the amount lost through the cleaning process.

The Government contends that as the merchandise was not entered for warehouse it is not entitled to the benefits of section 562, and there is no provision in the law permitting the repacking of merchandise which has been entered for consumption.

The question here is whether or not merchandise entered for consumption and deposited in a bonded warehouse and thereafter cleaned is subject to duty upon release to the importer "in its condition and quantity, and at its weight, at the time of withdrawal from warehouse," as provided for in section 562.

The merchandise in all of the entries was regularly entered for consumption, the duties paid, and delivery permits issued. At the request of the importer the collector sent the merchandise to the importer's own bonded warehouse under general order provisions. (See section 490.) In respect to the one 1934 entry it does not appear that any such order to send the merchandise to the bonded warehouse was issued. However, the merchandise covered by such entry was actually in said bonded warehouse. Thereafter requests were made and granted by the collector for permission to clean the rye in said warehouse under the provisions of section 562. The merchandise was cleaned to the satisfaction of the Department of Agriculture and released from the warehouse, but not, however, upon the issuance of warehouse withdrawal orders.

The sections of the Tariff Act of 1930 in question provide as follows:

SEC. 490. GENERAL ORDERS.

(a) INCOMPLETE ENTRY.—Whenever entry of any imported merchandise is not made within the time provided by law or the regulations prescribed by the Secretary of the Treasury, or whenever entry of such merchandise is incomplete because of failure to pay the estimated duties, or whenever, in the opinion of the collector, entry of such merchandise can not be made for want of proper documents or other cause, or whenever the collector believes that any merchandise is not correctly and legally invoiced, he shall take the merchandise into his custody and send it to a bonded warehouse or public store, to be held at the risk and expense of the consignee until entry is made or completed and the proper documents are produced, or a bond given for their production.

(b) AT REQUEST OF CONSIGNEE.—*At the request of the consignee of any merchandise,* or of the owner or master of the vessel or the person in charge of the vehicle in which the same is imported, *any merchandise may be taken possession of by the collector after the expiration of one day after the entry of the vessel or report of the vehicle and may be unladen and held at the risk and expense of the consignee until entry thereof is made.* [Italics not quoted.]

SEC. 491. UNCLAIMED MERCHANDISE.

Any merchandise of which possession has been taken by the collector which shall remain in bonded warehouse or public store for one year from the date of importation *without entry thereof having been made and the duties and charges thereon paid,* and any merchandise, destined to a foreign country, entered for transportation in bond through the United States, which shall remain in the United States during a period of one year from the date of its arrival at the port of exit (but in no case less than one year after the effective date of this Act) *without having been entered for consumption or warehouse,* shall be considered unclaimed and abandoned to the Government and shall be appraised by the appraiser of merchandise and sold by the collector at public auction under such regulations as the Secretary of the Treasury shall prescribe. All gunpowder and other explosive substances and merchandise liable to depreciation in value by damage, leakage, or other cause to such extent that the proceeds of sale thereof may be insufficient to pay the duties, storage, and other charges, if permitted to remain in public store or bonded warehouse for a period of one year, may be sold forthwith, under such regulations as the Secretary of the Treasury may prescribe. [Italics not quoted.]

SEC. 557. ENTRY FOR WAREHOUSE—WAREHOUSE PERIOD—DRAWBACK.

Any merchandise subject to duty, with the exception of perishable articles and explosive substances other than firecrackers, may be entered for warehousing and be deposited in a bonded warehouse at the expense and risk of the owner, importer, or consignee. Such merchandise may be withdrawn, at any time within three years (or ten months in the case of grain) from the date of importation, for consumption upon payment of the duties and charges accruing thereon at the rate of duty imposed by law upon such merchandise at the date of withdrawal; * * * *Provided,* That the total period of time for which such merchandise may remain in bonded warehouse shall not exceed three years (or ten months in the case of grain) from the date of importation. Merchandise upon which the duties have been paid and which shall have remained continuously in bonded warehouse or otherwise in the custody and under the control of customs officers, may be entered or withdrawn at any time within three years (or ten months in the case of grain) after the date of importation for exportation or for transportation and exportation to a foreign country, * * * and upon such entry or withdrawal, and exportation or shipment, 99 per centum of the duties thereon shall be refunded.

Merchandise entered under bond, under any provision of law, may, upon payment of all charges other than duty on the merchandise, be destroyed, at the request and at the expense of the consignee, within the bonded period under customs supervision, in lieu of exportation, and upon such destruction the entry of such merchandise shall be liquidated without payment of duty and any duties collected shall be refunded.

SEC. 562. MANIPULATION IN WAREHOUSE.

Unless by special authority of the Secretary of the Treasury, no merchandise shall be withdrawn from bonded warehouse in less quantity than an entire bale,

cask, box, or other package; or, if in bulk, in the entire quantity imported or in a quantity not less than one ton weight. All merchandise so withdrawn shall be withdrawn in the original packages in which imported unless, upon the application of the importer, it appears to the collector that it is necessary to the safety or preservation of the merchandise to repack or transfer the same: *Provided*, That upon permission therefor being granted by the Secretary of the Treasury, and under customs supervision, at the expense of the proprietor, merchandise may be cleaned, sorted, repacked, or otherwise changed in condition, but not manufactured, in bonded warehouses established for that purpose and be withdrawn therefrom for exportation to a foreign country or for shipment to the Virgin Islands, American Samoa, or the island of Guam, without payment of the duties, or for consumption, upon payment of the duties accruing thereon, in its condition and quantity, and at its weight, at the time of withdrawal from warehouse,  *  *  *.

Section 490 relative to merchandise placed in General Order grants a right to an importer to have his merchandise placed in warehouse at his own expense pending the regular entry thereof. After an entry of the merchandise has been regularly filed the warehousing thereof, under the plain wording of the statute, is terminated. Therefore it is clear that inasmuch as the merchandise herein had been regularly entered, the duties paid thereon, and a delivery permit issued, the deposit of the merchandise in warehouse was not made under the provisions of section 490.

Section 491 provides that any merchandise of which the collector has taken possession which shall remain in bonded warehouse or public store for 1 year from the date of importation without entry thereof having been made and the duties and charges thereon paid shall be sold at public auction. Clearly the merchandise before us here is not entitled to be held in a bonded warehouse by the collector under this provision of the law.

Section 557 provides that any merchandise *subject to duty* with certain exceptions may be entered for warehousing and deposited in a bonded warehouse and in the case of grain *may be withdrawn* at any time within 10 months from the date of importation *for consumption* upon payment of the duties and charges accruing thereon at the rate of duty imposed by law upon such merchandise at the date of withdrawal. It is further provided that grain remaining in warehouse for ten months upon which the duties have been paid and which have been continuously in a bonded warehouse or otherwise in the custody and under the control of customs officers, may be entered or withdrawn within such 10-months' period, for exportation or for transportation and exportation to a foreign country and upon such entry or withdrawal and exportation 99 per centum of the duties thereon shall be refunded.

The merchandise before us was entered for consumption, the duty paid, and delivery permits issued. At the request of the importer the collector placed the merchandise in the importer's own bonded warehouse. While there it was inspected by the Department of Agri-

·culture and found to be contaminated. Said Department thereafter authorized the collector of customs to issue permission to recondition the merchandise by removing the objectionable material. Application was then made by the importer on customs Form 3499 to recondition by drying and cleaning as required by the Food and Drug Administration of the Department of Agriculture. Such application was approved by the collector and the United States storekeeper at the warehouse was permitted to allow such manipulation, even though the merchandise was not entered for warehousing under the provisions of section 557 or under any other provision of the law.

Section 562 provides that merchandise shall be withdrawn from warehouse in the original packages in which imported unless, upon application of the importer it appears to the collector that it is necessary for the *safety* or *preservation* of the merchandise to repack or transfer the same. Upon permission granted by the Secretary of the Treasury merchandise may be cleaned, sorted, repacked, or otherwise changed in condition, at the expense of the "proprietor" under customs supervision, and may be withdrawn for consumption upon payment of the duties accruing thereon in its condition and quantity, and at its weight at the time of withdrawal from warehouse.

Although the collector had approved the application to clean the merchandise, it does not appear that such permission was granted with the approval of the Secretary of the Treasury. Cleaning processes applied to merchandise under section 562 clearly pertain to merchandise entered for warehouse because a withdrawal is contemplated and also the payment of duties at the time of withdrawal. The merchandise herein, although subjected to a cleaning process in a bonded warehouse, was not cleaned within the meaning of the permission granted in section 562, first, because it was duty-paid merchandise, and second, it entered consumption without withdrawal from warehouse, being merely released for consumption without the issuance of a withdrawal permit.

After the duties were paid' and the delivery permits issued, the collector had performed all of his duties in connection with the imported merchandise. Any detention of the merchandise thereafter would have been for other than customs purposes. Therefore the privilege allowed the importer of having the merchandise retained in a bonded warehouse for his own convenience in meeting the demands of the Department of Agriculture could not be construed as an action beneficial to the collector. All actions taken by the customs authorities after the issuance of the delivery permits were performed as agents of the Department of Agriculture. The custody of the merchandise in warehouse was in fact the custody of the Department of Agriculture rather than the collector. Consequently the merchandise herein is in the same position as if it had been delivered to the importer under

a redelivery bond awaiting the action of the Department of Agriculture under the pure food laws. Such being the case, the law as announced by our appellate court in the case of *Rosenbaum Grain Corporation et al.* v. *United States*, 26 C. C. P. A. 202, C. A. D. 18, in respect to the duty to be taken upon reconditioned Polish rye, is equally applicable to the merchandise before us here.

In the case of *United States* v. *De Villamil*, 12 Ct. Cust. Appls. 255, T. D. 40267, certain meat was imported during the time the Tariff Act of 1913 was in effect. It was duly entered for consumption and the importer would have been entitled to delivery upon entry were it not for the fact that paragraph 545 of the act of 1913 and the Treasury regulations required the collector to detain the same to enable an inspection of the meats by the Bureau of Animal Industry of the Department of Agriculture. The merchandise was not released until after the adoption of the Emergency Tariff Act of 1921 and the collector levied duties thereon according to that act, whereas the act of 1913 allowed free entry thereof.

The court held that inasmuch as the meats were imported and entered for consumption during the Tariff Act of 1913, their dutiable status is determined by that act for the reasons following:

> The meats imported were not withheld from delivery because of any customs service which remained to be performed, and it can not be said, therefore, that the goods were in customs custody for customs purposes. They were withheld by the collector of customs acting for the Bureau of Animal Industry and were therefore in law and in fact in the custody of the Bureau of Animal Industry.

Upon the authority of the foregoing case it would seem that the rye before us here was in the custody of the Department of Agriculture rather than the customs authorities.

In the case of *Rosenbaum Grain Corporation, supra,* certain Polish rye was entered for consumption, the duties paid, withdrawn from customs custody and placed in the importer's private warehouse, where it was cleaned under customs supervision and the visible impurities destroyed. An allowance in duties was made for the portion of the shipment destroyed under customs supervision. No allowance, however, was made for the loss of weight because of the moisture, dust, chaff, etc., which disappeared in the cleaning process.

The court was unable to find any definite testimony as to the respective amounts of loss due to evaporation, dust, chaff, excreta, etc., other than the amount of excreta actually recovered in the cleaning process. The court could not agree with the importers that all of the loss resulting from the cleaning and drying of the rye should be considered as a nonimportation. The court in that respect stated:

> * * * It is clear that a part of such loss arose in the drying of the rye, the so-called "good rye" released weighing less at the time of such release than it did at the time of entry of the rye. It is admitted that this "good rye" was imported

and therefore none of it may be considered as a nonimportation. There is no claim that at the time of entry the rye contained excessive moisture, but on the contrary it is established that it did not.

There is no evidence in the record from which it can be ascertained what proportion of the loss was due to dust, to excreta, or to screenings, etc., which could not be preserved for destruction under customs supervision. While the entire loss is established, and the quantity of excreta, etc., destroyed under customs supervision is also established, the difference between these two amounts is shown only as consisting of loss through moisture, dust, excreta, etc., which passed off in the air in the cleaning and drying processes, and *necessarily the separate amounts of each could not be determined.* This is termed in the evidence as an "invisible loss." [Italics ours.]

The court was unable to ascertain the difference between the weight of the "good rye" when released and its weight at the time of entry, since there is nothing to show what the "good rye" weighed at the time of entry. The court observed, however, that "the *so-called 'invisible loss,' insofar as it consisted of dust, chaff, etc., was properly a part of the dutiable weight of the rye,*" because it did not appear that the same was in excess of the usual amount found in such merchandise and there was no evidence to show what part of the "invisible loss" constituted such excreta.

In the case here, the quantity of visible impurities in each shipment was ascertained, also the loss because of drying. The so-called invisible loss resulting from the cleaning process was also ascertained in each case. As stated by the court in the foregoing citations, that part of the dust, chaff, etc., contained in the "invisible loss" was properly a part of the dutiable weight of the rye. The weight of the excreta and other impurities not usually found in the merchandise was not separately ascertained, but is only accounted for as a part of the "invisible loss" which also contains substances dutiable with the rye itself. Were it possible to ascertain the weight of the excreta and other impurities, an allowance therefor would have been properly made.

Had the rye in question been free from contamination, the importer would not have requested the collector to send the shipment to general order, but would have presented the delivery permits and obtained delivery of the merchandise. Upon ascertaining that the rye was so contaminated that it was subject to an exclusion order of the Department of Agriculture, the collector was prevailed upon to act as he did for the benefit and convenience of the importer. The detention of the merchandise in General Order was not because of any additional acts required to be performed before the merchandise was subject to release by the customs authorities. Therefore under authority of the *De Villamil* case, *supra*, we hold that the deliveries of the rye to the bonded warehouse bear the same status as if actually delivered to the importer; that the merchandise herein is not entitled to the

benefits of section 562, and duty was properly assessed by the collector.

For the reasons stated, judgment will be entered in favor of the defendant.